Good morning again. Would counsel just come up here? We have a few questions and we don't want to detract from anyone's time. That is counsel on both sides. Also, we'd like some general indication as to the number of claimants. The briefs talked about a half a million, maybe greater or lesser. And the third thing was how is the trust composed? That is what are the assets, what's going into the trust as presently constituted? You know, what part is our insurance proceeds? What part are contributions by the company and so forth to the extent that you know that at this time? That is a series of challenging questions, Your Honor. I'm Peter Lockwood representing the affilies in this case. Could you lift this up a little bit, please? What? Yeah, that's good. Thanks. The status of the trust, the plan has been consummated. The trust has got trustees, it's operating, and it's processing claims in general. With respect to the – there are complexities associated with this trust that are not reflected in the brief. The federal mogul had multiple subsidiaries, and several of those subsidiaries had independent lines of asbestos liability. They were not – they were companies that had been acquired by the parent over time. But prior to the acquisition, they had had businesses that involved the production and the distribution of asbestos-containing products. As a result, the trust itself is comprised of separate sub funds. The particular debtor and the particular sub fund that this case involves is a subsidiary of federal mogul called Federal Mogul Products Corporation, or FMPC. It, in turn, is the successor by name change to a company called Wagner Electric Company. Wagner Electric Company, prior to its acquisition by federal mogul, was owned by a number of other predecessors. The Wagner Electric sub – let me back up a second. Under the plan, the trust as a whole, including the various sub funds, got essentially stock in the parent company, federal mogul, and in different sub funds, assignments of, in some instances, settlement, in some instances, unsettled insurance. The federal mogul products sub fund, this is – you could be – there's the trust distribution procedures are in the joint appendix, and you can follow this. The federal mogul products – well, if you want to get down into the weeds, Your Honor, you can, but as I say, it's complicated. Anyway, the federal mogul products sub fund has been given a modest share of the cash from the sale of the federal mogul parent company stock that was occurred at or shortly after the effective date of the plan. In addition, it has received an assignment of the insurance coverage that's alleged, albeit disputed, to cover the claims against federal mogul products corporation. To the best of my knowledge, the bulk of that insurance has not been settled and is being litigated in a state court action involving a number of the appellants here and the trust in which the trust is seeking to obtain coverage under these policies. That litigation is ongoing. It is unresolved. I do not believe – I mean, I could check in the audience. I believe there may be some representatives of the trust here. I don't believe that the trust is paying any claims at this point because it is not found out yet whether or not it's going to have the insurance that was assigned to it, either as a result of a decision by this court in this case or as a result of adverse decisions in the state court litigation in New Jersey. And as a result, the number of – the claimants don't have any incentive to file claims at any great rate because there's nothing to pay them. And so I don't believe that there is – I know of no count of the number of claimants that have yet filed claims against federal mogul products. I will say in candor that the 500,000 claims figure, Judge Sirica, that you referred to, I cannot represent to you that that was a figure that was limited to the federal mogul products claims that were going to the sub fund as opposed to perhaps including claims that were going to other sub funds in the trust because of claims against other debtor entities that were part of this consolidated plan. I hope that's helpful. I'm Russell Roden with Duane Morris representing the London Market Insurance. I'd like to add just a couple of things to that. We made some points in our brief about how the shares were transferred, and I don't think – I think that's correct. It came out of the documentation for the case and for the trust. What I would suggest to you – I can't answer your questions either, but the trust has a website, very active. If you go on the website, it's got lots and lots of information. They'll give you a tutorial on how to make a claim if you're interested, but I think you'll get a lot of information directly off the website. If I had known the court was interested, I would have been happy to go there and get the information. No, no, that's helpful. Danielle Spinelli for Hartford. What Mr. Lockwood said is consistent with my understanding. My understanding is that the trust is operating and processing claims but not the FMP claim stream. Okay, good. Any questions? Thank you. Thank you very much. Ms. Spinelli. May it please the Court, Danielle Spinelli for Hartford. With the Court's permission, I'd like to reserve five minutes for rebuttal. Sure. Thank you. This appeal presents a question of broad importance to a wide variety of federal and state laws and regulations that apply to debtors in bankruptcy. Whether 1123A of the Bankruptcy Code preempts non-bankruptcy law governing the transactions a debtor specifies as a means for implementing its plan. That is, can a debtor transfer a state property, which is what's at issue here, merge with a competitor or issue stock under Chapter 11 Plan notwithstanding federal and state law restrictions on those activities? The Ninth Circuit, which is, I believe, the only court of appeals to analyze this issue in detail, has held that Section 1123A doesn't extend that far. Now, can I ask you something about that PG&E case? Of course. The Ninth Circuit essentially takes a piece out of 1142A and puts it into 1123A, right? I believe so, yes. Okay. So this is a matter of basic statutory construction. If Congress chooses to say something in one section of a statute and chooses not to say it in another, isn't the ordinary course to assume that Congress knows what it's doing and it intends a limitation where it inserts one and it doesn't intend it where it doesn't? Absolutely, Judge Jordan, and that's why our analysis is slightly different from that of the PG&E court. We believe the court reached the right result in holding that 1123A doesn't preempt restrictions on transfer of estate property, but I don't think it's necessary to read language from 1142A into 1123A to reach that result. I understand that, but I guess my question is a little bit different. It's not only that one might think that the Ninth Circuit's approach was suspect, but doesn't the same reason that the Ninth Circuit's reasoning is suspect in fact support your opponent's position here? That is, Congress spoke very broadly in 1123A. They knew how to speak narrowly when they wanted to, and they did in 1142A. And they didn't in 1123A, and that should say something to us, should it not? Well, with respect, Judge Jordan, I believe that the relationship between Section 1123A and Section 1142A strongly supports our position. Well, but read in isolation, doesn't the plain text of 1123A state volumes about Congress's intent? Well, let me speak to that, Judge Smith. The statute, by the way, is reprinted on page 1A of the statutory addendum to our blue brief. Of course, we have to keep in mind that as the Supreme Court has repeatedly cautioned, a provision of the Bankruptcy Code can't be interpreted in isolation, and something that might seem clear in isolation or might seem ambiguous in isolation will be clarified by the role that that provision plays in the Code as a whole, and I think that's true here. If we look at the text of 1123A itself, I think a reading that's at least equally plausible looking just at this text is that the express preemptive language, notwithstanding any otherwise applicable non-bankruptcy law, modifies the seven requirements that a debtor has to include in its plan. And it's quite clear that this notwithstanding language is expressly preemptive. It preempts any law that would conflict with what's in 1123A. I think the difference in our position and APLEI's position is that APLEI's read this statute, read this provision to be empowering, to give debtors the power to undertake any of the transactions listed under 1123A-5, notwithstanding contrary non-bankruptcy law, whereas we read this provision to be prescriptive, to say – to tell the debtor these are the seven things you must put in your plan. Sure. Now, we're well familiar, I think, with what the respective positions are, and what we're trying to get at here is underlying reasoning. And to your point that this needs to be read in the context of the Code, I'm wondering whether it's meaningful that Congress, in enacting Section 524, specifically contemplated that there was going to be a way to deal with massive asbestos liability in the United States of America, and that that was going to involve some structure akin to what we're dealing with now. And if we read 1123A in light of 524, as your own argument suggests we ought, doesn't that say something to us about avoiding the kind of limitations that you seem to be suggesting are inherent in 1123A? I don't believe so for a couple of reasons. For one, obviously, as you know perfectly well, this provision sweeps much farther than assignment of insurance policies to a trust. It involves transfer of any property of the estate of whatever kind and the remaining nine transactions that are listed. That's not to say that 524G isn't relevant to the particular issue of insurance assignments. But I think it's important to be clear that the question before us is not, does Section 524G impliedly preempt those restrictions? The question is, does 1123A expressly preempt those restrictions? I think the analysis is quite different. Does the existence of 524G have any influence on how we should look at 1123A, or should we just be setting that aside when we're looking at what 1123A is? I mean, I think that 524G is another example of the basic phenomenon that when Congress wrote the Bankruptcy Code and it wanted to depart from the way that non-bankruptcy law orders the rights and obligations of the parties, it does so expressly and in great detail. That's the case with 524G. That's the case with many other provisions throughout the code that deal with these 10 transactions. In the 524 integrated systems case, that's the case with 1123A, right? I apologize, Judge Jordan. What was the question? You just said it speaks expressly when it wants to preempt. And the language of 1123A is, as you and your briefing concede, preemptive language. Absolutely. We're talking about scope here. Nobody is saying it's not preemptive, right? That's absolutely right. And I guess a better question from me ought to be what is it about 1123A, read in light of 524G, that makes you think there's not the power that your opponents are asserting is in that section, 1123A? Well, there are several reasons why we believe that. I don't think that it makes sense as a matter of statutory interpretation to construe 1123A in light of 524G. Did combustion engineering do that? I don't believe so. Don't you think we can draw some force from, I guess it's footnote 23, in combustion engineering? Doesn't that tell us something? Doesn't that carry some weight in your adversary's argument here? Judge Smith, I certainly appreciate that this issue has been argued to the court before. Some members of the court have expressed the view that CE is binding precedent on this question. I'm certainly not here to argue with this court about what it held or did not hold. Oh, why not? This is your opportunity to do just that. Okay. Well, given the invitation, I'm happy to accept. Or why we were wrong. Yeah. We don't believe that CE prevents this court from reaching the merit of the issue. Primarily, well, for a couple of reasons. For one, that discussion in CE wasn't necessary to the court's holding. The court vacated and remanded the confirmation order on other grounds, and therefore on the grounds that the injunction that was entered exceeded the court's powers, and therefore that section of the court's opinion wasn't necessary to its judgment. That discussion also doesn't deal in any detail with 1123A. It discusses the objection of the London insurers to the assignment of their policies. It explains that Section 541 of the Bankruptcy Code, and I apologize, Judge Sirica, this is on page 218 of the Combustion Engineering Decision, 218 to 219. He knows it by heart. I wish I didn't. It explains that Section 541 preempts any restrictions that would prevent the debtor's property from coming into the estate. That's something that's, you know, undisputed by anyone, certainly correct. And then says, in this case, that didn't happen because the policies at issue are policies issued to non-debtors. Therefore, London can raise its objection to the assignment, but we're not going to consider the merits of the issue. We're going to vacate. That's not necessary because we're vacating the confirmation order on other grounds. And although footnote 27, as you mentioned, Judge Smith, does mention 1123A5, I would find it odd if this court were to have, in just a footnote that adverts to the provision without much explanation, broken with the Ninth Circuit, which issued its decision in PG&E just a year before. And it resolved a question that's of sufficient importance that 18 state attorneys general filed a brief supporting our position when this was argued before the court in GIT. Those are my reasons for believing that CE isn't binding and that this court can reach the merits. In your briefs, you say that the plan's treatment of the anti-assignment provisions changes. And you're on our time. We expect that this is going to go beyond the allotted time period. It somehow materially changes the risk that you contracted for. And your opponents say that's not really the case, that it does not. And even in our opinion in global technologies, the en banc court distinguished the silica situation from the asbestos situation, where you'd had decades of experience. And I recognize that the insurance industry has had a problem with the asbestos liability, that way back the comprehensive general liability policies were written on an occurrence or an accident basis, and that you got some unfavorable or the insurance industry got some unfavorable decisions that really collapsed all the coverage even beyond the terms with a continuous trigger analysis. And now those policies have been changed and it's on an occurrence basis. I'm sorry, it's on a claims made basis, no longer an occurrence basis. Explain to me why the risk has changed here if these matters are assigned to the trust without the anti-assignment provision. I think our only submission here, Judge Sirica, is that Section 1123A doesn't bar us from making that argument in state court. As Mr. Lockwood said, there's ongoing insurance coverage litigation. This defense has been raised by the insurers. The litigation is still in the discovery stage. And I think it's going to require a detailed inquiry into the facts and circumstances surrounding the trust to know exactly to what extent it may have changed our risk. Is that a distinction without a difference? Well, in one of the reply briefs it says, Appellee's characterization of consent to assignment clauses as granting insurance of veto over 524G reorganizations is wholly inaccurate. Appellants do not contend that debtors cannot transfer insurance rights to a 524G trust. Rather, they simply seek to preserve insurer's right to argue in subsequent coverage litigation that a non-consensual assignment provides a defense to coverage, etc., etc. Which is what I think I heard you just, in essence, say a moment ago. Correct. I guess what I'm asking is, is that a distinction without a difference? If you say, well, yeah, you can put it in, but we're going to still assert the anti-assignment provision, what meaning does it have to say, yeah, you can put it in? If at the end of the day you say, we still deny that there's any way you can recover because of the anti-assignment provision. I don't believe it is a distinction without a difference because of the nature of the defense based on the consent to assignment clauses. State law, as a rule, does not enforce consent to assignment clauses unless the assignment has increased the insurer's risk. Then that takes me back to Judge Sirica's question, which is, how is your risk meaningfully different if the claims are being processed through the trust system as opposed to in the tort system? Well, I think that GIT is a good example of the kind of case in which that might be so. In that case, this court recognized that the establishment of a Silica trust attracted many claims that hadn't previously existed. Sure, but as has been pointed out, this isn't that case, right? We're talking about asbestos liability that has been wrestled with for decades. That's absolutely correct, and we're not in a position now, and I don't think now is the, you know, as the parties have agreed, the only question that we were going to raise now is the pure legal question of does 1123A preempt this defense. That defense under these facts and circumstances may prevail or it may not. I don't know, and I can't answer that question, but I think our only submission is that 1123A doesn't bar us from raising it, and that that doesn't prevent 524G plans from going forward because of the nature of the defense. Do you have a basis for saying that your risk is materially different in the trust as opposed to in the tort system? Yes. The main difference between processing claims through the trust and processing them in the tort system is that the insurer loses its ability to defend the claims as they're tendered. Rather, the claims are resolved through abbreviated administrative procedures. They may be subject to laxer standards than would be applied in the tort system. I'm not saying that those problems exist here, but those problems certainly exist with asbestos trusts as well as silica trusts, and I think our only submission is that 1123A doesn't bar us from making that particular argument. Is that a problem that's better addressed to Congress than to the courts? Well, I think it is a question that's appropriately addressed to the courts. It's also a question that Congress could address. If Congress wanted to expressly preempt this defense, it certainly could do so. I believe that it hasn't yet. The question now is the more general one of what did Congress mean in 1123A? Did it mean the preemptive language to extend as far as Applebee's would have it? I think it's quite clear that Congress couldn't have meant that because were that so, much of the rest of the bankruptcy code, including 1142, which governs the implementation of a plan, would be surplused. I'm sorry. I'm curious when you say Congress couldn't have meant that. If Congress is setting up, specifically looking at a problem of national scale, and it's inserting into the bankruptcy code provisions that it thinks will address this problem of national scale, is it your contention that in setting this up, Congress meant for insurance proceeds, which were clearly a significant asset of these beleaguered companies facing asbestos liability, were not to be subject to this program it was setting up? No, I wouldn't say that at all. Again, I think that's a question about conflict preemption with Section 524G, which I think is a much... Isn't it a question to figure out what 1123A means? Well, that's what I believe is the question before this court. Would it be unreasonable to conclude that Congress would want to limit the court's ability to implement a plan to a greater extent than they wanted to limit the party's ability to create a confirmable plan? Would that be unreasonable to conclude in light of the language of 1123A? I don't see why Congress would have wanted that system, Judge Smith, because it seems to me that... Would it be unreasonable to conclude that as a matter of statutory... I actually believe that it would be because it doesn't make sense to me that Congress would, on the one hand, grant sweeping authority to brush aside all non-bankruptcy law with regard to transactions that can be used to implement a plan, and then with the other say, well, but when you go out and implement your plan, we're only preempting laws relating to financial condition. I think the more plausible way to read the statute is that Section 1123A doesn't empower the debtor to undertake these transactions notwithstanding otherwise applicable non-bankruptcy law. Other provisions of the Bankruptcy Code do that where it's necessary to override non-bankruptcy law. And then 1142 gives the debtor the authority to go out and implement those transactions and do what's necessary to make the plan work notwithstanding state laws relating to financial condition, which might limit its ability to undertake those transactions because it had been a debtor. Let me ask you this. Everyone agrees that 1123A has some preemptive scope. Correct. And it seems to me that the FCX case in the Fourth Circuit and Pacific Gas can be reconciled. The result in Pacific Gas makes sense to me, if not the reasoning, because you had a significant public policy issue that it seems to me that the states had a legitimate interest. Maybe the federal government does, but certainly the states did there. Why shouldn't we be thinking of ways to cabin or limit the scope of 1123A? Somewhat along the lines of Pacific Gas and involving public health, safety, or welfare, but not with respect to private contracts. I think the fact that the Court raises that question illustrates the difficulties with Apolli's interpretation. We agree with the difficulties issue. Were it the case that Section 1123 preempts otherwise applicable non-bankruptcy law governing transfer of property of the estate, I don't see how, as a matter of statutory interpretation, it can make a difference whether the property is rights under insurance policies, as it is here, or a nuclear power plant. You don't see a distinction between the public safety interests implicated by the operation of a nuclear power plant and the contractual money interests of individuals? Oh, I certainly do. What I don't see is any textual basis for reading that limitation into 1123A. It would be a very odd way of writing a statute, and I think very inconsistent with what Congress has done throughout the rest of the Code, to say we're going to give the debtor sweeping power to undertake whatever transactions it wants to implement its plan, notwithstanding otherwise applicable non-bankruptcy law, and then we're going to let bankruptcy judges sort out whether some particular law is of sufficient importance as a matter of public policy not to be preempted. I think that's not generally how Congress works when it preempts state law. It does so clearly and expressly. It's done that in other sections of the Bankruptcy Code, and I don't believe it's done it here. Thank you.  Ms. Spinelli, thank you very much. We'll have you back on rebuttal. Mr. Rutten. Morning. Good morning. Still morning. I'm Russell Rutten. I'm with Duane Morris. I represent certain underwriters at Lloyd's London and certain London market companies. I have 13 minutes assigned to me. If I have any left over, I'd like to reserve a rebuttal. If I don't, that's fine. I'll use it up now. Well, we'll give you a couple minutes of rebuttal anyway. Thank you. I would like to address basically three points, and I think the three points I want to talk about are the three points that you want to talk about. First, I want to talk about combustion engineering and what combustion engineering says and what I think combustion engineering means. Combustion engineering, the discussion about assignment in combustion engineering was all in the section of the opinion having to do with standing. This court took the objecting insurers and the London market insurers and put them into a separate component and addressed the issues relating to them in the opinion. The court will remember that London market insurers only assured Basic and Loomis, who were not debtors in that case. The court looked at what happened down at the bankruptcy court level with what was then called the super preemptory language. And this is what the court said. Of course, this court said the super preemptory language provided in the plan that nothing in the plan would impair the insurer's prepetition rights. That's what the court said at page 216. As such, in addressing the insurer's voting argument, the bankruptcy court emphasized that the plan had been modified to make it clear that nothing impairs their rights. The bankruptcy court found that the assignment of insurance proceeds to the Asbestos PI Trust did not impair the rights of the insurers because the rights of the insurers shall be determined under the subject insurance policies or subject insurance settlement agreements as applicable and nothing in the plan is to affect that. That is a clear, straightforward statement that the reason the London insurers did not have standing in this court was because their assignment rights were to be determined under the insurance policies. That's what this court said. This court then went on to say, as both the bankruptcy court and the district court recognized, the super preemptory provision broadly preserves the insurer's prepetition rights under the subject insurance policies and settlement. That's what this court held. At this point in the case, that's on pages 216 and 217. At this point in the case, there had been no discussion about 1123A5. Nothing. The discussion about 1123A5 came up later. It was the second-to-last paragraph in Section 3B of the opinion. And it came up because the court said London market insurers object to the assignment. What assignment were they talking about? London market insurers insured non-debtors, basic and limits. And London market insurers objected that the non-debtors policies could be assigned into the bankruptcy state. And you agreed. That's a valid objection. London had standing to make that objection. And in doing the analysis, what you did was you looked at Section 541 of the bankruptcy code. 541 says that the assets of a debtor, the property of a debtor, are automatically transferred into the bankruptcy estate. That's what it says. And you said, well, basic and limits weren't debtors. Their property didn't come into the bankruptcy state. That's exactly right. And there's nobody in this case who is saying, who is raising an objection that federal moguls' assets came into the bankruptcy estate. That's all you talked about there. It was footnote 27, Judge Smith. And in footnote 27, you footnoted this discussion. You had four sentences in that footnote. The first sentence talked about 541, transfers into the estate. And the next sentence quoted Section 541. The third sentence said, I wrote it down here somewhere. The third sentence says the bankruptcy code expressly contemplates the inclusion of debtor insurance policies in the bankruptcy estate. Nobody has ever disputed that except in combustion engineering where they were trying to put in basic and limits as policies to the estate so they could get the channeling junction. That's not applicable here. And then the court put in footnote 1123 and cited footnote 1123A5 in that discussion presumably to say, yes, you can transfer into the bankruptcy estate because the concept of transferring out of the bankruptcy estate to a trust or any other third party was not addressed by this court. Now, what happened when the 1123A5 footnote was put in there? And, again, I think the court must have put it in just to support its conclusion that 541 allowed the transfer of the assets into the estate. That has now been read by the appellees to say, oh, you all approved the transfer of property out of the estate under 541 and 1123. Not just read by the appellees, read by a whole slew of courts, right? It's been read by bankruptcy. A lot of bankruptcy court decisions and district court decisions. And we've heard argument that it's also effectively been adopted as the meaning of combustion engineering in an en banc decision of this court. Well, I disagree with that if you're talking about the JIT case. I'm saying that's what's been argued to us. Well, it's wrong. That argument is wrong. And I'm here to tell the court why it's wrong, and I'm going to face that question from the court. Excellent. The JIT case had to do with bankruptcy court standing. The combustion engineering case had to do with appellate standing, only appellate standing. This court was very, very careful in saying what has to be – an entity has to suffer to have appellate standing. One of the things is impairment of rights. The court was very specific. I think he quoted that two or three times in combustion engineering. The JIT case was not about appellate standing. It was about bankruptcy court standing. And what this court essentially rules was that the funny business that was going on with the silica claims was enough that the insurers at the bankruptcy court level could say, hey, you know, this ain't right. You know, we need to address this. And you said, yes, they should. There's a footnote in there which says we're not deciding assignment in the JIT case. You did not decide assignment in the JIT case. It wasn't as part of your decision. And what I'm telling you today is that your decision in combustion engineering decided assignment to the estate, but it did not decide this assignment out of the estate. And if I could, Your Honor, can I just make one point? If you were going to use 1123A5 to preempt state law, you would have done more than stick 1123A5 in a footnote. You would have discussed it and analyzed it. Okay. So how did all those bankruptcy and district court decisions manage to go so far awry? Because there is a long string of them that's been tied to us that have read combustion engineering that way and even I think some not relying on combustion engineering which arrive at the same place. What is it? So let's talk about assuming you're right that combustion engineering doesn't decide the issue, where's the error in the reasoning that is being pressed on us by the official committee here in saying that 1123A in conjunction with 546, excuse me, 524, is part and parcel of a plan Congress has put in place to address this very thing and if you read it the way you're suggesting to us, it's defeating the intent that Congress has for how to address this problem of national magnitude. It is not, Your Honor, and I would like to address that in two respects. First, Your Honor raised the question about reading 1123A5 in conjunction with 524G and trying to dig out the intent of Congress in doing it, correct? I understand that's the argument that's being made to us by the other side. Yes. Well, Your Honor, I would direct the court to statute 524G and it has so many subparts I cannot at my age just remember what they are, but I think it's in 4A Romanet 1 subpart 3. And what this says is it's about the injunction and who gets the benefit of the injunction. You know, they have to just do certain things to get the injunction. We argue in their brief they didn't do that in this case and they're not entitled to come in here and argue the benefit of 524G when they ignored 524G, but that's another argument. The point I'm making right now is that under 4A1, 2, and 3, it says who gets the benefit of the injunction and it says notwithstanding and so on and so forth, the third party who is identified from the terms of the injunction alleged to be directly or indirectly liable for the conduct, demands, et cetera, by reason of, and there are four criteria. The third one is the one that's important here. The third one is the third party's provision of insurance to the debtor or a related party. Congress thought about insurers. Congress definitely thought about insurers and they definitely put it in 524G and they said, hey, insurance companies, if you want this case off your backs, you can go in, you can pay into the trust, you're not even, insurance companies aren't even debtors. In the world of bankruptcy, it's generally debtors and creditors. Insurance companies are neither. So Congress specifically thought about insurers  and we're going to say if you guys are willing to pay, we'll give you the channeling injunction. Now, if this nexus of 524G and 1123A5 is supposed to explain what Congress is thinking, then what I would say to the court is if Congress meant that the insurer's policies had to be assigned under 1123 or some other law, they would have put it right here and they would have said and the insurance policies must be assigned to the trust and they didn't say that. Well, there's a difference between have to be assigned and can be assigned, right? Well, I'm saying that if their argument is they must be assigned, it would be here. Otherwise, you can't interpret 1123A5 and 524G together. It has to be the argument. Your Honor, this statute is based on the Johns Manville decision. There was no assignment of insurance policies in Johns Manville and there have been other cases where there's no assignment of insurance policies. It's not mandatory. Cases are approved. This reorganization was completed years ago and there's been no determination as of today as to the assignment of these policies. So their argument that, well, you've got to look and pull these two together, 524G speaks volumes. If there had been a mandate from Congress to assign the policies, it would be written right here and it's not written there. There is no mandate. There was no mandate under Manville and there's no mandate here. It was never intended to be. The other argument I think that I would like to address in my last 25 seconds is what the court raised, I think, the jet argument the court questioned. And that is, you asked, Judge Jordan, you asked, what's the risk? How's the risk change? And one of the responses to Your Honor was that, well, that's what the state court decides. If there's no change in the risk, the policies are assignable. I'll tell you what the changes in risk are very simply. There's two of them, two categories. First change in the risk is London market insurers insured a bunch of companies a long time ago. They didn't insure any of these debtors, but these debtors are suing and state court trying to get the coverage there. This is excess, this is reinsurance or excess? Excess insurance. And when they did that, they put a number of terms in those policies governing their risk. They put in, what's the coverage? How much are we going to cover? What's the premium? How much do we get? And they put in the consent to assignment clause. And at that time, what was in the minds of everybody was that whoever that insured is, when they start getting claims in from the outside, they're going to resist those claims and only pay valid claims. And the reason for that is because they don't want to blow all their policy limits paying invalid claims. And so they have an incentive to work with the insurers to keep those claims down. Well, what happened here if they get their way? What happened here is they keep their insurance. I hope the court is aware that they did not assign the insurance policies. They are keeping their insurance. They only assign what they call insurance rights. In other words, they're telling the insurers that, okay, once this trust is set up, we're assigning to the trust. They can sue you for coverage for asbestos cases, but we're still keeping our coverage because Carl Icahn owns us now and we're going to be a big company. We need our coverage. There's no assignment. What that means is they just doubled the risk of the insurer. There's not one group of companies now that's covered. It's a group of companies plus a trust who has a fiduciary obligation to pay claims, not to resist anything. To pay valid claims? To pay valid claims, Your Honor. And what's going on in this trust, if the court looks at these TDPs, they pay claims that the statute of limitations has run on. They pay claims with no medical criteria at all. Okay. So you've given us a couple of different things to talk about. Okay. One is the risk is different because the trust is really not trustworthy. It's going to pay people who shouldn't get paid. You won't just get valid claims paid. You'll get invalid claims paid. Set that aside for a minute. And go back to your first point, which is it doubled the risk. Yes, sir. You're not suggesting, are you, that if they hadn't assigned these right and the claims had come to them, you wouldn't be paying them, right? I don't understand the court's question. Well, the coverage is what it is. And the claims that would be paid, assuming they were valid claims, would be paid, at least theoretically, setting aside the concern you set, would be paid if they were valid in a tort system or in the trust system. Is that right? No. We say that claims would have been paid in the tort system where there are judges and juries and standards of proof, and people have to come into court and prove they're hurt, that they're sick, and it came from this particular insurer. That's the tort system. That's what our clients contract it for. Right. Not a trust system. Work with me here. Okay. I'm trying to set to the side the assertion that, oh, the trust will pay invalid claims. Okay. Leaving that piece over here and assuming for the sake of discussion that you will, in keeping with your contractual obligations, you'll pay on valid claims, and you would do that in the trust system or in the tort system because you're obligated to pay valid claims. Right? If that's the obligation you've got, how is it a doubling of your risk if that set of risk is not something that they are holding on to, but that set of risk, which is risk you contracted for, is spun off to the trust? I'm having a hard time coming to grips with the doubling of the risk assertion. Well, the first point is we have another entity to deal with, and under cases the state law of assignment in determining whether the risk has been increased, that is one factor they look at is whether now we have to deal with two parties instead of one. Moreover, we're not dealing with the assured is resisting payments. We have to deal with a trust process, and as I said earlier, I would invite you to go look at this website. I don't hear that as a direct response to Judge Jordan's mathematical question. Well, I'm sorry. It would not seem to be a doubling, and I'm having the same difficulty as Judge Jordan. Again, putting aside the payment because of the profound differences, admittedly, between the types of process that are available to you in a tort system and in a trust system, how is there anything more at stake than that piece that Judge Jordan's arguendo question posed? The payment of claims that you would contend are simply invalid and would not have been processed successfully by the claimants through a tort system. Well, we think those claims are the vast majority. All right. So that's what's at stake, not a doubling. Well, maybe a doubling is wrong. Maybe I shouldn't have said that, but a substantial increase in the risk. Would that be more acceptable? Maybe I shouldn't say doubling. We're just hearing your arguments. Okay. Okay. So you're in a different situation as well. I mean, if it were five claims, you might litigate each one of them individually. If there are a million claims, you might not litigate each one individually. That's right. There might be class action claims. There were class action claims brought over the years. There's been multidistrict litigation for these asbestos claims where all of them have been sent off to one federal court to handle. States, they've got these waiting lists. If you don't have any symptoms, you have to go get on the waiting list, and then if you get sick later on, you can bring them back. There's all kinds of responses that various courts have made to this problem. This is Congress's responsibility. Let me ask. Any other questions? We'll give you three minutes for rebuttal. Thank you. Surely. Mr. Lockwood. Good morning, I think. Good morning. Because the case has been briefed pretty thoroughly, I'm going to try and focus my remarks here this morning on some of the issues that have been raised by the court. Maybe you ought to start off with what Judge Jordan started off with, the difference between 1123 and 1142A. Why should we not import the financial condition into 1123? Well, I mean, I thought Judge Jordan answered his own question in that regard when he pointed out that the Supreme Court precedent on this issue about importing a section of one statute into another separate statute that doesn't contain that provision is simply not an acceptable means of statutory interpretation. Well, just because we asked the questions doesn't necessarily mean that we ---- Well, I interpreted it more as a statement. But, I mean, the answer is I believe it is simply an improper method of statutory interpretation. And, moreover, it's one which at least Appellant Hartford isn't urging on this court. Appellant Hartford doesn't want you to say that the lettered subsections of A5 have preemptive effect if you read in laws relating to financial condition in the preamble. They have a much different statutory approach and the London market people have adopted it. They break 1123A into two sets of components, what I'll call the numbered subsections and the lettered subsections. And they admit that the numbered subsections have preemptive effect. They have admitted that in their papers and they admitted it here today. What their argument is without regard to reading in laws relating to financial condition, what they argue is that the lettered subsections are merely sort of illustrative means that might be permissible or might not be permissible depending on state law because they assert the notwithstanding language ends with the numbers. And our response to that, frankly, Your Honor, is that even if they're right about that, 1123A5, simpliciter, without reference to the subsections, still preempts consent to assignment clauses. And the reason for that is that as virtually every member of the court has inquired so far, that section requires that a plan contain, quote, adequate means, close quote, for its implementation and this is a Section 524G plan. So this is a Section 524G plan which is authorized by the Bankruptcy Code that must contain adequate means for its implementation. What does a 524G plan have to contain? Under the statute, it must contain a trust which will assume all of the debtors as best as personal injury liabilities without exceptions or qualifications to whether those liabilities are insured liabilities or uninsured liabilities. Secondly, it provides for an injunction channeling all of these as best as personal injury claims into the trust. Can you respond in that context to Mr. Roten's discussion of 4823 of Section 524? Well, Mr. Roten has correctly pointed out that the Section 524G permits and ensure that wishes to resolve its coverage issues with a debtor insured to make a contribution that under Section 524G4B2 is fair and equitable to future claimants. And if that contribution is adequate for that purpose, they will be able to get an injunction prohibiting claimants from doing what the Bankruptcy Code would otherwise permit which is under Section 524E of the Bankruptcy Code to which 524G is an express exception. The discharge of a debtor does not discharge or otherwise free any party co-liable on the debtor's obligations from liability. And that's what insurance companies are. They are parties that are co-liable because they have insured the debtor's liabilities. And there is no dispute among the parties to this appeal that absent 524G and absent an assignment to the trust and absent a discharge, that provision would, or even in the presence of a discharge, that provision would permit direct actions by claimants against insurance companies. Well, I don't want to speak for Mr. Roten or any of you all who are so much more knowledgeable about the Bankruptcy Code than I will ever be. But in a real simple way, I understood him to be saying that here's where Congress would have said really plainly, hey, all those proceeds, they're going into this trust by a channeling injunction, if that's what they meant to say. They just said it right here. No, because. Insurance companies, it was on their mind. They weren't just ignoring it. It would have been right here. What's your response to that? My response was that the issue of unsettled insurance was simply not before the Congress when this statute was drafted. What had happened in the Manville case, which Mr. Roten refers to, is that there was, in fact, a lot of insurance involved in the Manville case. The Supreme Court's decision in Travelers v. Bailey addresses some of the consequences of that insurance. Unlike this case, however, all of the Manville insurers agreed to settle their claims. Like the debtors, the Manville insurers were concerned about whether a 105 injunction under the code would adequately stand up to potential collateral attacks from future claimants on due process grounds, among others. So they went to Congress, and they got a statute passed that essentially said, well, even though there's problems with definitions of claims and due process and futures, we'll create a structure under which future claims, again, that would otherwise potentially not be discharged in bankruptcy, can be instead channeled to a funded trust and insurers that are also contributing to that trust, namely the Manville insurers, can receive the protection of an injunction. But it didn't even purport to address what other assets of a debtor could be transferred to a trust as part of the debtor's contribution. Keep in mind, the assignment here is, I think, maybe it was Judge Jordan mentioned earlier, or maybe it was Judge Sirica, these insurance rights, which are specific, asbestos coverage rights, they're not, as Mr. Rodin argued, they're not the policies themselves, but they're asbestos coverage rights. These rights are property of the debtor estate. The debtor, in this case, the debtor's predecessors, because as I mentioned before the argument started, this is a federal products subsidiary, but the purpose for purchasing insurance for a business corporation is to protect that corporation's assets from these particular kinds of claims. And the beneficiaries of that protection are the corporation, its stockholders, its creditors, et cetera. And if I understand Ms. Spinelli and Mr. Rodin's argument, the counter to that is that's why companies buy insurance, but insurance companies sell insurance to companies with specific limitations and risk analyses in mind. And that if Congress had wanted to steamroll those expectations in the way they say this interpretation of 1123A would roll over them, it would have done so more plainly. It would not have said to an entire industry, yeah, we know you insured these companies with an idea that if they had claims, you'd have an opportunity to raise your defenses, including coverage in the court system. But never mind all that. Now you're going to get rolled into a trust with anticipated procedures and processes that are vastly different and that are going to result in higher liability. But if Congress had meant for all that to happen, it would have said so. Your Honor, in this case, in agreement with these affilies, there is an insurance neutrality clause that preserves, for state court litigation, every single defense of the sort that Your Honor has just, and Mr. Roten and Ms. Spinelli have articulated earlier, except whether or not the successor trust can access this insurance coverage. If the trust pays claims that are considered to be invalid or too generous, they can assert defenses to those claims on the ground either that they were denied their claims handling rights under the policies, that's one defense they'd have that they assert in state litigation, that they have not consented to the settlement made by the trust at those claims, that's another defense that they have in state court litigation that is preserved, that the insured here, the trust, did not cooperate with them in the defense of those claims, that's yet a third defense that they have in state court. Every single risk that has been articulated by counsel for any affiliate in this case relates to a provision that they retain the right to raise in state court litigation under the insurance neutrality clause. You reject the assertion that we're hearing from this same microphone a few minutes ago, that there's not just a shifting of venues, there's a qualitative difference in the character of the risk that they are required to undertake once this is sent through a channeling injunction into a trust whose purpose is to pay claims. Their policies identified the qualitative risks as the ones I described. The consent to assignment was a generic provision that essentially, to use an example that I think was taken from one of their opening briefs, it would prevent the mom and pop grocery store from selling their insurance coverage to General Motors. Here, the liabilities that are being sought to be brought against this coverage are liabilities of the insured. The trust has no independent liabilities. It's not General Motors. The mom and pop grocery store is the Federal Mogul Products Corporation, and the trust is still the mom and pop. And with respect to this idea that they're dealing with two entities, the channeling injunction protects Federal Mogul Products, who, according to Mr. Roden, retains all this wonderful insurance from being sued by anybody. They're barred. They're enjoined. So the only entity, there's only one entity, and that's the trust, and there's only one set of claim liabilities, the Federal Mogul Product historic liabilities. And what these insurers want to do is to go to a state court judge and say, well, you know, we have this boilerplate provision about any assignment. We're protected on every other ground, but this, the trust, is not the same entity as Federal Mogul Products, and that in and of itself is the reason why we can walk this coverage. With my colleague's indulgence, this is the last question. Can you speak more broadly to the policy implications of reading 1123A as you have suggested? When Judge Sirica was questioning the Spinelli, you recall the questions going to the Ninth Circuit's PG&E decision and whether as a matter of policy and understanding what Congress was getting at, it's right and appropriate to understand that the breadth of the preemption you're asking for is actually a dangerous thing. Well, Your Honor, let me approach it. Actually, I started to do that earlier. We'll give you some additional time. We view this as a narrow issue. What's before the court is does Section 1123A, in conjunction with other sections, preempt? The insurers want to create this dichotomy under which they agree that 1123A preempts but disagree that the subsections of A5 preempt, and they raise what we call the parade of horribles, you know, violation of antitrust laws, sale of drugs to minors, transfer of liquor licenses in violation of public health. We have essentially two responses to that. One is the one laid out in our brief, which is essentially, look, this is the way Congress wrote the statute. It's expressly preemptive. But there's plenty of case law, such as the Midlantic case, just as an illustration, where courts have taken bankruptcy statutes, which on their face gave very broad authority to a debtor, and limited them through the application of 1129A3, in some instances, or just through the application of what you might call a common law, public safe and healthy exception, to otherwise preemptive statutes. And so far, every court other than PG&E has felt that that interrelationship was adequate. But here, we don't even need to go that far. Before you take the next step, I want to make sure I understand what you have just said. Your assertion is that there's always a public health, safety, and welfare exception that is read into these things, so relax. Well, I'm not sure I would phrase it precisely that way, but I guess that's a fair characterization at the end of the day, that there is a mechanism for preventing abuse of preemptive reading in a statute, and judges do that sort of thing all the time in the Supreme Court. So that is, if this panel were looking at this case as a search for a limiting principle, that is, that we didn't find a satisfactory answer in the plain text of 1123A as being an express preemption. We looked beyond that for some limiting principle here. That would be the limiting principle that you offer. That's a limiting principle. I understand that. I have another limiting principle, which is what I call the narrow reading, and which touches on some of the points made by members of this Court earlier. Going back to what 524G requires, I talked about it requires a trust. It requires an injunction protecting the debtor and other protected parties against future claims, which can include insurers. It requires that the trust treat present, similar, present and future claims in substantially the same manner, i.e., there's an equal treatment provision in 524G for the trust. And finally, it requires that the trust be funded with sufficient assets to render the issuance of the injunction against future claims fair and equitable. Thus, in summary, for a Section 524G plan to provide adequate means for its implementation, it would have to provide for, one, a trust, two, a channeling injunction, three, adequate trust distribution procedures, and four, adequate funding to render it fair and equitable. We submit that if there was a state law that, for example, prevented an asbestos debtor from creating a trust or said that future claimants could sue companies without regard to whether there was a trust or not, or that said that you couldn't have trust distribution procedures that would treat presents and futures in substantially the same manner.